UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------x
:
**NOA KOLP**,                                        :         Index No. _____
:
:
Plaintiff,       :         **COMPLAINT**
:
— against —                :
:
**ELIE TAHARI LTD,**                      :         **JURY TRIAL REQUESTED**
:
Defendant.       :
:
:
-------------------------------------------------------------------------x

Plaintiff, Noa Kolp (*"Kolp"* or *"Plaintiff"*) by her attorneys, Sack & Sack, LLP, file the

following Complaint against her former employer, Defendant Elie Tahari, LTD (*"Elie Tahari*

*LTD"* or "*Defendant*").

Ms. Kolp, as and for her complaint, alleges as follows:

## NATURE OF THE ACTION

1.      Plaintiff complains that her former employer, Elie Tahari LTD, engaged in the

unlawful discrimination and subsequent retaliation of Plaintiff in the terms, conditions, and

privileges of her employment in violation of Title VII of the Civil Rights Act of 1964, 42

U.S.C.A. § 2000e, ("*Title VII*") based upon her sex, female.

2.      Plaintiff further complains that Defendant engaged in the unlawful discrimination

and retaliation of Plaintiff in the terms, conditions, and privileges of her employment in violation

of New York State Human Rights Law, Executive Law § 290 et seq. ("*NYSHRL*") and the

Administrative Code of the City of New York § 8-101 et seq. ("*NYCHRL*") based upon her sex,

female.

3.     Plaintiff files this action to seek monetary relief for the denial of equal employment opportunity and for the unlawful employment practices of Defendant.

4.     Plaintiff further complains that she has suffered, is suffering and will continue to suffer severe economic and non-economic damages because Defendant deprived Plaintiff of her employment rights in violation of federal and state law.

5.     Plaintiff filed a timely Charge of Discrimination with the United States Equal Employment Opportunity Commission ("*EEOC*"), which bore charge number 520-2016-03132.

6.     Plaintiff timely brings this action within ninety (90) days of the receipt of a Notice of Right to Sue Letter ("*NORTS Letter*"), issued by the EEOC on February 22, 2017.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 and supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.  In addition, the Court has jurisdiction over Plaintiff's claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e.

8.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(a).  Venue in this matter is properly laid in the District because the violations of the Plaintiff's federal and state civil rights occurred during the course of their employment at branch office locations in this District, because the Defendant does business in this District, and because most of the fact witnesses and evidence are common to or most convenient to this District.

## PARTIES

9.     Plaintiff is an individual who, at all times relevant to this Complaint, has resided and currently resides at 372 Central Park West, #7R, New York, New York 10025.

2

10.     From June 2014 until her unlawful termination on January 29, 2016, Plaintiff was employed by Defendant.

11.     At all times relevant herein, Plaintiff was an "employee" within the meaning of 42 U.S.C.A. §§ 2000e, et seq., § 296 of the NYSHRL and under § 8-102(1) of the NYCHRL and thus, afforded protection against sexual harassment and discrimination and retaliation in employment on the basis of her sex, female.

12.     At all times relevant to this Complaint, Defendant is a corporation licensed to do business in the State of New York, with offices located at 11 West 42nd Street, 14th Floor, New York, NY 10036, County of New York.

13.     At all times relevant herein, Defendant is an "employer" within the meaning of 42 U.S.C.A. § 2000e-(b), § 292 of the NYSHRL and under § 8-102(5) of the NYCHRL.

## FACTS COMMON TO ALL COUNTS[1]

The claims set forth herein arise from the following set of facts:

14.     Plaintiff is a married woman with three children.  Plaintiff is protected under the State and City discrimination statutes protecting employees.

15.     In May 2012, Plaintiff graduated with a Master's degree in Journalism and a certificate in Economics and Business Journalism from Columbia University. Plaintiff was granted a full scholarship and stipend by Columbia University.

16.     In June 2007, Plaintiff graduated with a Bachelor's degree in Economics from the Hebrew University of Jerusalem.

17.     Plaintiff is a talented and experience business developer, strategist, and analyst,

---

1. All directly quoted statements, unless otherwise specified, are the sum and substance of such statements as recalled by Plaintiff.

and has worked for the Defendant since June 2014.

18.     Plaintiff's previous employer was Yatir VC. In April 2013, Plaintiff began her employment at Yatir VC as Head of Business Development for two of Yatir's startups, Flu3er and Mika. In this role, Plaintiff prepared business plans to increase Yatir's startups' growth, including the companies' marketing, branding and sales strategies.   Plaintiff managed the marketing and business development teams, led the implementation of the companies' business plans, and significantly improved performances in sales and exposure to relevant audiences.

19.     Prior to working for Yatir VC, Plaintiff had a 12-year career as Head of the Business and Economics Desk, Chief Editor, Analyst and Senior Economics and Business Correspondent.

20.     In February 2014, Plaintiff gave birth to her second daughter.

21.     In June 2014, Plaintiff accepted an offer from Elie Tahari LTD and the Tahari family office.

**Hiring- Duties**

22.     On June 16, 2014, Plaintiff began her employment as Elie Tahari's business manager.

23.     Plaintiff was hired by Elie Tahari ("*Mr. Tahari*"), the CEO and Chairman of Elie Tahari LTD and the owner of the Tahari family office. Plaintiff reported directly to him.

24.     Plaintiff was hired as a consultant and remained a consultant until November 19, 2015.

25.     In this capacity, Plaintiff assisted Mr. Elie Tahari in managing Elie Tahari LTD and Tahari family office business matters.

26.     During Plaintiff's time at Elie Tahari LTD and the Tahari family office, Plaintiff

4

worked every day, all day, and the company paid her days off.  Beginning in 2015, the company also paid Plaintiff's health insurance.

27.    When Plaintiff commenced her employment, Elie Tahari LTD was missing strategy, structure and key positions.  Mr. Tahari was very frustrated and unhappy with the way the company was managed as well as with how the Tahari family office was functioning.

28.    At the start of Plaintiff's employment, Plaintiff's compensation was $80,000 annually.

**Accomplishments - Performance**

29.    From the commencement of Plaintiff's employment, up until and continuing through the date of Plaintiff's termination, as a direct result of Plaintiff's hard work, savvy business acumen, expert communication, and team building, Plaintiff significantly improved Elie Tahari LTD and the Tahari family office structure, functionality, and level of employees.

30.     For example, Plaintiff was responsible for putting together a strategic plan for the company. The plan consisted of major changes needed to improve the company's efficiency and ways to create growth. The plan defined and prioritized the company's goals for the short term (2016) and for the longer term (2017-2020). The plan was presented to Mr. Tahari, who was very satisfied and directed Plaintiff to implement it.

31.    Plaintiff was able to lead many significant projects at the company and helped Mr. Tahari to make decisions based on solid data. For example, Plaintiff led the strategy of keeping the T Tahari and Tahari brands, the less expensive brands, as part of Elie Tahari LTD.  Mr. Tahari accepted Plaintiff's recommendation and rejected the offer to license these brands out. Plaintiff was heavily involved in structuring and organizing the new team for these brands as

well as recruiting the team.

32.     Another example is Plaintiff's taking the lead on finding a new platform for the company's website. Mr. Tahari accepted Plaintiff's recommendation to hire a specific company that was able to re-platform the site very quickly and in a way that improved the online sales significantly and immediately.  Plaintiff managed the transition from one platform to another, built a revenue share model with the new developing and hosting company, and negotiated the terms and agreement.

33.     As it became clear that Mr. Tahari would not be able to significantly grow the company without a partner, Plaintiff also introduced Mr. Tahari to private equity companies and potential investors.

34.     The company's need for employees, including senior executives, was significant and urgent during Plaintiff's time at Elie Tahari LTD.  The employee retention rate at Elie Tahari LTD is very low, and recruiting new employees to the company is extremely difficult, as the company's reputation is very bad.

35.     As Mr. Tahari would not work with recruiting agencies due to the high cost of their services, Plaintiff assumed this responsibility.  Plaintiff was able to recruit more than 20 employees, including CFO, SVP of E-commerce, VP of Creative, VP of visual merchandising, President of Marketing, SVP of Tahari Sales, senior sports designer, Senior Director of Design Operations, and more.  Plaintiff recruited more than $3 million worth of annual payroll.

36.     For this kind of work, recruiting agencies would charge recruiting fees of $600,000 to $1,000,000, between 20%-33% of the candidate's yearly compensation package. Mr. Tahari told Plaintiff many times during their work together how great and valuable Plaintiff's job was for the company.

37.     Plaintiff was also able to build Mr. Tahari's family office. The family office takes care of Mr. Tahari's personal matters, including the management of his investments and assets, his schedule, and his home and kids.  Mr. Tahari wanted to entirely change the team.  Plaintiff was able to convince him to retain the head of administration, CJ Bouscaud, and replace the head of the family office; and when Mr. Tahari's executive assistant of over eight years left in 2014, Plaintiff recruited a new executive assistant for him.   Mr. Tahari was always grateful for Plaintiff's efforts in taking care of his family office.

**Plaintiff Receives a Pay Raise and Visa Sponsorship**

38.     On or about October 1, 2014, Plaintiff told Mr. Tahari that she planned to leave the company and the U.S. in January 2015.  Mr. Tahari was very upset and immediately said that he would do whatever needed to make Plaintiff stay.  Plaintiff explained to Mr. Tahari that the reason she needed to leave was that her husband, who was at that time an economic counsel for the state of Israel in New York, had been called back to Israel to fill an open position in the ministry of finance, where he had worked for many years. As a senior governmental employee, Plaintiff's husband had a guaranteed job and generous salary until his retirement.

39.     Mr. Tahari asked Plaintiff to stay and told Plaintiff that he loved working with her.  He added that they would be very successful working together.  He promised to sponsor Plaintiff's Visa and to raise Plaintiff's salary to $220,000 beginning in 2015.  Mr. Tahari also decided to immediately raise Plaintiff's salary to $100,000.  Plaintiff accepted his offer.

40.     In December 2014, Plaintiff reminded Mr. Tahari of their agreement.  At this time, he repeated his promise to pay Plaintiff an annual salary of $220,000 beginning in 2015 and to sponsor Plaintiff's Visa, which they did.  In the Visa application documents, the company

declared that the annual salary for Plaintiff's position was $220,000.

## Plaintiff's Salary is Unilaterally Reduced

41.    In January 2015, Plaintiff's compensation was indeed raised to $220,000, as promised.  After a few months, however, Mr. Tahari told Bruce Fine, the previous CFO, that Plaintiff's salary is actually $200,000.  Plaintiff reminded Mr. Tahari of their conversation, but he insisted on lowering Plaintiff's compensation to $200,000 at this time.

42.    In June 2015, Plaintiff's H1B Visa was approved. To be qualified for H1B, Plaintiff needed to become an employee of the company starting in October 2015.

43.    In early August 2015, Plaintiff advised Mr. Tahari and the president of the company, Jake Pleeter ("*Pleeter*"), that she would be leaving the U.S for three weeks at the end of August, as she needed to change her Visa.

44.    Plaintiff also reminded them that the company would have to hire her as an employee beginning in October 2015.  Mr. Pleeter asked what Plaintiff's current compensation was, and Plaintiff answered $200,000.  Mr. Pleeter then asked Plaintiff what compensation Plaintiff was looking for as an employee, and Plaintiff said that she would like to receive what Mr. Tahari had promised to her - $220,000.  Mr. Pleeter said, **"No problem."**  He promised that he would take care of it and would speak with Mr. Tahari.  He further said that Plaintiff deserved this salary.

45.    Before Plaintiff left for Israel, Mr. Pleeter promised to convince Mr. Tahari to agree to a salary of $180,000.  Plaintiff told Jake again, **"That is not what I was promised."**  Plaintiff and Mr. Pleeter agreed to continue the discussion upon Plaintiff's return to the United States.

46.     In September, when Plaintiff returned from Israel, Mr. Pleeter began to negotiate Plaintiff's salary, role, and title with Plaintiff.  He started with $180,000, and then cut the offer to $175,000. After few days, he told Plaintiff that Mr. Tahari did not agree with this number and offered $150,000.

47.     Plaintiff told Mr. Pleeter over and over, both during these negotiations and prior, that Plaintiff had a different agreement with Mr. Tahari.  Plaintiff also informed Mr. Pleeter of everything Plaintiff's family gave up so that Plaintiff would be able to remain working for Elie Tahari LTD.  Plaintiff told Mr. Pleeter that she had her back to the wall, as she could not leave while she was on the company's Visa; and her options were limited, as there are not many companies who are willing to hire H1B Visa employees.  Plaintiff further said that she could not go back to Israel, as her husband had just found a job in New York, and her two little girls were in school.

48.     A few days later, Mr. Pleeter told Plaintiff the best he could offer to her was $135,000.

### Plaintiff's Salary is Unilaterally Reduced

49.     In November 2015, during Plaintiff's discussions with Mr. Pleeter, he asked Plaintiff to focus more on HR, as **"This department is purely managed by the HR manager, Eileen Porcelli."**

50.     The company's CFO, Jeff Green ("*Green*"), was also involved in these conversations.  Mr. Green asked Plaintiff to oversee the HR department, as he had **"no faith in Eileen Porcelli's capabilities to lead the department."**  Mr. Tahari agreed in a conversation with Plaintiff that this was a great idea.  Plaintiff agreed to lead the department.

51.     On November 19, 2015, as Plaintiff realized that she had no other choice, she signed the company's offer letter reflecting an annual salary of $135,000, starting November 1st; Mr. Pleeter had decided the agreement would be retroactive, beginning November 1, 2015. Plaintiff's title was changed to Senior Director of Business and Organizational Development reporting to both Mr. Tahari and Mr. Pleeter.  Plaintiff's new role and responsibilities were never officially announced.

## Communicating the Pregnancy News

52.     On January 3, 2016, Plaintiff sent an email to the HR manager, Eileen Porcelli ("*Porcelli*"), advising her that she was pregnant.

53.     On January 4th, Plaintiff told Mr. Pleeter that she was pregnant.

54.     On January 16th, Mr. Tahari saw Plaintiff in the show room and congratulated her, saying: **"Mazal Tov! Mazal Tov!"**

## Exclusion and Retaliation

55.     Once Plaintiff advised Ms. Porcelli and Mr. Pleeter of her pregnancy, Mr. Tahari and Mr. Pleeter barely paid attention to Plaintiff and no longer kept her in the loop regarding work-related matters.  Plaintiff was excluded from discussions about topics that previously she had been heavily involved in: she was not invited to the meetings about cutting overhead and reorganizing the company, nor was she involved in the new seating order for the wholesale and retail teams.

56.     Up until this point, Plaintiff had been responsible for gathering information, analyzing data, and following up on the reorganization and saving plans for the company. Previously, Plaintiff had also been invited to the different meetings about the reorganization and

saving plans and was part of the decision-making.  She was heavily involved in the last round of employee reductions in November 2015, and she was in charge for months of the seating order at the company.

57.     Once Plaintiff noticed that she was being excluded due to her pregnancy, Plaintiff told Mr. Tahari, **"I am being excluded from all these meetings that I was part of just weeks ago, and it doesn't make sense to me."**  Mr. Tahari responded that he was aware and that he would make sure that Plaintiff would be invited to future meetings.  This never happened.

58.     On or about January 11, 2016, Mr. Pleeter came to Plaintiff's office on behalf of Mr. Tahari to propose the following:

      a)   Plaintiff would work in her current role at an annual salary of $85,000 for two and one-half days per week. Mr. Pleeter mentioned that he might need to officially mark it as three days, rather than two and one-half days. He also said that he was not sure whether Mr. Tahari would agree to this amount of money and that he might want to pay $50,000-$60,000;

      b)   The agreement would be retroactive, starting January 1, 2016;

      c)   Plaintiff would receive paid maternity leave of three months.  Mr. Pleeter wanted Plaintiff to work one day per week during maternity leave; and

      d)   Plaintiff's annual salary for 2016 would be guaranteed.

59.     Mr. Pleeter threatened that Mr. Tahari would fire Plaintiff and cut off Plaintiff's medical benefits if Plaintiff would not accept the proposal.  He told Plaintiff, **"Oy vey! How are you planning to give birth without health insurance?"** In response, Plaintiff

told him that she could not agree to his proposal, because she would not survive financially under those conditions, and that she needed the money to support her family.  Plaintiff added that, as Mr. Pleeter was aware, Plaintiff had taken a significant pay cut only four weeks ago.  Plaintiff also explained that she would not be able to find a new job while pregnant.  Plaintiff told Mr. Pleeter that she would legally fight the company if she were to be fired as a result of not accepting these new terms.

60.    Mr. Pleeter said that it would be hard for Plaintiff to do this, as Plaintiff would not have any cash flow and would need to pay her health insurance herself.  Mr. Pleeter added that Plaintiff would not be able to financially sustain the legal process, deposition, hearings, arbitration, etc.  He said that if Plaintiff had the financial strength to sue the company, she should **"go for it."**

61.    In response, Plaintiff asked Mr. Pleeter to put himself in her shoes and to ask himself how she was supposed to survive financially with $85,000 after her salary was already cut from $220,000 to $200,000 to $135,000.  Mr. Pleeter relented and said that Plaintiff deserved a salary of $225,000.  He added that Plaintiff is **"super smart"** and that he had **"no doubt"** that the company needed Plaintiff.

62.    Mr. Pleeter told Plaintiff, again, that Mr. Tahari would fire Plaintiff unless she accepted his offer.

63.     On or about January 14, 2016, Mr. Pleeter repeated his proposal.  He threatened, again, that Mr. Tahari would fire Plaintiff if she did not accept it.  He said that Mr. Tahari was determined to let Plaintiff go if she would not compromise.   In response, Plaintiff told Mr. Pleeter that she was willing to take on more responsibilities and roles of other people.

12

64.     On or about January 15, 2016, Plaintiff emailed Mr. Pleeter (the "*January 15th email*") advising him that his proposal was not acceptable and that she intended to work full time in her current job at her current rate of pay of $135,000, including benefits, through the date she would go out on a temporary leave for the birth and post-natal care of her child.  During those three months of paid maternity leave, she would work remotely as would be mutually agreed. Plaintiff asked Mr. Pleeter to stop harassing her.

65.     On or about January 17, 2016, Plaintiff advised Mr. Tahari that Mr. Pleeter was harassing Plaintiff on his behalf and threatening that he (Mr. Tahari) would fire Plaintiff and cut her medical benefits if she would not accept his proposal to cut her salary.

66.     In response, Mr. Tahari asked Plaintiff if she could work fewer days per week and be paid less.  Plaintiff advised Mr. Tahari that she would not be able to take another pay cut and that it would be very hard for her to find a job while pregnant.  Plaintiff told Mr. Tahari that firing her now would be the wrong thing to do, especially after the wonderful job she had been doing for the company.

67.     In response, Mr. Tahari, avoiding all pertinent topics, said merely that Plaintiff had always been friends with Mr. Pleeter and that they would stay friends.

68.     After Plaintiff sent Mr. Pleeter the January 15th email, he completely stopped speaking to Plaintiff.  Mr. Tahari avoided meeting with Plaintiff as well, and her updates with him were canceled over and over again.  The CFO, Jeff Green, was barely responding to Plaintiff's emails, despite her knowledge that he was in fact reading them.  Plaintiff had to call and email him many times in order to get a response.

69.      During this time, in late January 2016, Plaintiff discovered that she was being excluded from the search for a network administrator for the IT department, even though Mr.

Green of the company had approved, weeks before then, a process requiring Plaintiff's signature prior to any search for a new hire commencing.

70.     However, neither Ms. Porcelli, the HR manager, nor Rachael Clare Faulds, who reported both to Ms. Porcelli and Plaintiff, asked Plaintiff to sign the form before beginning the search.  Plaintiff discovered this after a few candidates had already been interviewed.

### Termination

71.     On or about January 29, 2016, less than a month after Plaintiff advised Defendant of her pregnancy, Plaintiff was called into Mr. Tahari's office with Mr. Tahari, Mr. Pleeter, and the Human Resources Manager, Ms. Porcelli, all present.

72.     Ms. Porcelli proceeded to explain that the company was going through a reorganization and that Plaintiff's role was being eliminated.

73.     At the same meeting, Mr. Tahari offered Plaintiff consultancy work with the company.  Plaintiff was offered one month of severance and paid COBRA.

74.     The decision to eliminate the position was made 10 weeks after the position was created and without giving Plaintiff a real chance to do her job and prove her capabilities. Plaintiff was also excluded from most of the meetings that were relevant to her new role, which it made it impossible for Plaintiff to fully and effectively do her job, especially with respect to the reorganization of the company.

75.     Additionally, the decision to eliminate the position was made at the same time that Elie Tahari LTD was paying JoAnne Blessinger, Mr. Tahari's ex-girlfriend, an annual salary of $250,000, even though she does not work for the company.  This arrangement is part of the couple's separation agreement, and the salary will be paid to her for four years for a total of $1 million (4 x $250,000).

14

76.     Additionally, the decision to eliminate the position was made at the same time that many of Mr. Tahari's family members, including his two sisters, two brothers, and nephew, were being paid salaries by the company.  Some of these family members are not working for the company and are only getting paid; these include Mr. Tahari's brother, his stepmother, and his ex-wife.

77.     Additionally, the decision to eliminate the position was made at the same time that Elie Tahari LTD was covering all the salaries of all of the Tahari family office employees, including the driver, two housekeepers, the head of administration, the head of the family office, and an assistant.

78.      Finally, the decision to eliminate the position was made 10 weeks after Plaintiff was no longer a joint employee of both Elie Tahari LTD and the Tahari family office.

79.     While Plaintiff was still working for the family office, Mr. Tahari had the means, through the family office, to purchase two apartments at 15 Central Park West, New York, New York for $26 million.  Plaintiff was asked to sign the closing documents with the lander.  Mr. Tahari also purchased, with a partner, a building at 88 University Street, New York, New York.  Mr. Tahari's contribution to the deal was $13 million.   Mr. Tahari was also renovating his apartment at 15 Central Park West for $5 million.

80.     A few minutes after Plaintiff was fired, Mr. Tahari and Mr. Pleeter called the General Counsel, Ran Daniel ("*Daniel*"), into Mr. Tahari's office.  Ms. Porcelli was there as well.  Mr. Tahari and Mr. Pleeter asked Mr. Daniel for his opinion with regard to the termination of Plaintiff's employment.  Mr. Daniel told them that they should have asked him before they fired Plaintiff, and that he believed that this was not the right thing to do, both legally and morally.   In response, Mr. Pleeter said that he had a legal opinion from the company's

employment lawyer that there was no problem to terminate Plaintiff's employment. Mr. Daniel said that he had never seen this opinion.

81.     After the conversation with Mr. Daniel, Mr. Tahari texted Plaintiff that he did not want Plaintiff to leave the company with anger, and that he wanted to **"work things out."** He also wrote, **"you are a big talent."**

82.     On February 1, 2016, in a conversation with Mr. Tahari, Mr. Tahari told Plaintiff that he needs Plaintiff's help and would like Plaintiff to come back to work for him as a consultant.

83.     Mr. Tahari offered Plaintiff (through the company's General Counsel, Mr. Daniel) two and one-half days of work from home per week for half of Plaintiff's previous salary and only until Plaintiff give birth.  Plaintiff asked to receive the proposal in writing and was told by Mr. Daniel that Mr. Tahari and Mr. Pleeter refuse to send any proposal in writing.

84.     A few days later, Mr. Tahari offered Plaintiff (through the company's General Counsel, Mr. Daniel) five months of severance.  Plaintiff asked, again, to receive the proposal in writing.  Plaintiff never received it.

| LEGAL CLAIMS |
|:---:|

## AS AND FOR A FIRST CAUSE OF ACTION

**SEX DISCRIMINATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964;
42 U.S.C.A. § 2000E**

85.     It is clear that Defendant made an adverse employment decision concerning Plaintiff based upon her pregnancy.

86.     Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

87.     Defendant's discriminatory behavior and then retaliatory termination of Plaintiff's employment were made as a direct result of Plaintiff's sex, female, and show an animus of sex bias.

88.     Defendant have undertaken these discriminatory practices willfully or with reckless disregard for the Plaintiff's rights protected under Title VII.

89.     These employment practices violate § 703 of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-2.

90.     As a result of Defendant's actions, Plaintiff was  unable to return to comparable employment for more than a year.

91.     The aforementioned acts of Defendant constitutes unlawful discrimination against Plaintiff in the terms, conditions and privileges of her employment because of her gender and in retaliation against her in violation of the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e.

17

92.     As a proximate result of Defendant's aforementioned sex discrimination against Plaintiff, Plaintiff has and will continue to suffer substantial losses, including the loss of past and future earnings, bonuses, deferred compensation and other employment benefits.

93.     As a further proximate result of Defendant's actions, Plaintiff has and will continue to suffer irreparable and significant damage to her personal and professional good name and reputation.

94.     As a further proximate result of Defendant's actions taken because of Plaintiff's sex, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

95.     As a result of the foregoing, Plaintiff is entitled to recover from Defendant, jointly and severally, an amount equal to the value of all compensation to be earned by Plaintiff had her employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

96.     As a result of the foregoing acts, Plaintiff is entitled to recover an amount to be determined at trial in compensatory damages from Defendant.

97.     In committing the acts alleged herein, Defendant acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages in an amount to be determined at trial to adequately punish Defendant, jointly and severally, and to deter Defendant from continuing and repeating such conduct in the future.

## AS AND FOR A SECOND CAUSE OF ACTION

### DISCRIMINATION ON THE BASIS OF GENDER UNDER
### NEW YORK STATE HUMAN RIGHTS LAW §296(1)(A)

98.     Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

99.     Defendant's discriminatory behavior and then retaliatory termination of Plaintiff's employment were made as a direct result of Plaintiff's gender, female, and/or pregnancy, and show an animus of gender bias.

100.    As a result of Defendant's actions, Plaintiff was  unable to return to comparable employment for more than a year.

101.    The aforementioned acts of Defendant constitutes unlawful discrimination against Plaintiff in the terms, conditions and privileges of her employment because of her gender and in retaliation against her in violation of the provisions of the NYSHRL § 296(1)(a).

102.    As a proximate result of Defendant's aforementioned sex discrimination against Plaintiff, Plaintiff has and will continue to suffer substantial losses, including the loss of past and future earnings, bonuses, deferred compensation and other employment benefits.

103.    As a further proximate result of Defendant's actions, Plaintiff has and will continue to suffer irreparable and significant damage to her personal and professional good name and reputation.

104.    As a further proximate result of Defendant's actions taken because of Plaintiff's sex, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

105.    As a result of the foregoing, Plaintiff is entitled to recover from Defendant an amount equal to the value of all compensation to be earned by Plaintiff had her employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

106.    As a result of the foregoing acts, Plaintiff is entitled to recover an amount to be determined at trial in compensatory damages from Defendant.

107.    In committing the acts alleged herein, Defendant acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages in an amount to be determined at trial to adequately punish Defendant and to deter Defendant from continuing and repeating such conduct in the future.

### AS AND FOR A THIRD CAUSE OF ACTION

**DISCRIMINATION ON THE BASIS OF GENDER UNDER
NEW YORK CITY HUMAN RIGHTS LAW § 8-107**

108.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

109.    Defendant's discriminatory behavior and then retaliatory termination of Plaintiff's employment were made as a direct result of Plaintiff's gender, female, and/or pregnancy, and show an animus of gender bias.

110.    Defendant's animus towards Plaintiff's gender, female, is revealed in instances where similarly situated male employees were treated differently than Plaintiff in respect to of their terms, conditions, and privileges of employment.

111.     As a result of Defendant's actions, Plaintiff was  unable to return to comparable employment for more than a year.

112.     The aforementioned acts of Defendant constitutes unlawful discrimination against Plaintiff in the terms, conditions and privileges of her employment because of her gender and in retaliation against her in violation of the provisions of the NYCHRL § 8-107.

113.     As a proximate result of Defendant's aforementioned sex discrimination against Plaintiff, Plaintiff has and will continue to suffer substantial losses, including the loss of past and future earnings, bonuses, deferred compensation and other employment benefits.

114.     As a further proximate result of Defendant's actions, Plaintiff has and will continue to suffer irreparable and significant damage to her personal and professional good name and reputation.

115.     As a further proximate result of Defendant's actions taken because of Plaintiff's sex, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

116.     As a result of the foregoing, Plaintiff is entitled to recover from Defendant, jointly and severally, an amount equal to the value of all compensation to be earned by Plaintiff had her employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

117.     As a result of the foregoing acts, Plaintiff is entitled to recover an amount to be determined at trial in compensatory damages from Defendant.

118.     In committing the acts alleged herein, Defendant acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and

Plaintiff is entitled to punitive damages in an amount to be determined at trial to adequately punish Defendant and to deter Defendant from continuing and repeating such conduct in the future.

## AS AND FOR A FOURTH CAUSE OF ACTION

### RETALIATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964; 42 U.S.C.A. § 2000E

119.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

120.    Based upon the aforementioned facts, Plaintiff had reasonable belief that Defendant was engaged in unlawful conduct under Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e.

121.    Plaintiff acted in opposition to such unlawful conduct by making good faith claims and/or complaints of sexual harassment and discrimination to Defendant and appropriate authorities, including the EEOC.

122.    Defendant had actual knowledge of Plaintiff's activities in respect of making good faith claims and/or complaints of sexual harassment and discrimination to Defendant and appropriate authorities, including the EEOC.

123.    As a proximate result of Plaintiff's activities in respect of making good faith claims and/or complaints of sexual harassment and discrimination to Defendant and appropriate authorities, including the EEOC, Defendant engaged in adverse treatment of Plaintiff, including, inter alia, demoting Plaintiff and terminating her employment.

124.    Plaintiff was unable, despite reasonable efforts, to find comparable employment.

125.    The aforementioned acts of Defendant constitute unlawful retaliation against Plaintiff in violation of the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e.

126.    As a proximate result of Defendant's aforementioned retaliation against Plaintiff, Plaintiff has and will continue to suffer substantial losses, including the loss of past and future earnings, bonuses, deferred compensation and other employment benefits.

127.    As a further proximate result of Defendant's actions, Plaintiff has and will continue to suffer irreparable and significant damage to her personal and professional good name and reputation.

128.    As a further proximate result of Defendant's actions taken because of Plaintiff's sex, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

129.    As a result of the foregoing, Plaintiff is entitled to recover from Defendant, jointly and severally, an amount equal to the value of all compensation to be earned by Plaintiff had her employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

130.    As a result of the foregoing acts, Plaintiff is entitled to recover an amount to be determined at trial in compensatory damages from Defendant.

131.    In committing the acts alleged herein, Defendant acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages in an amount to be determined at trial to adequately

punish Defendant and to deter Defendant from continuing and repeating such conduct in the future.

## AS AND FOR A FIFTH CAUSE OF ACTION

### RETALIATION IN VIOLATION OF NEW YORK STATE HUMAN RIGHTS LAW §296(1)(A)

132.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

133.    Based upon the aforementioned facts, Plaintiff had reasonable belief that Defendant was engaged in unlawful conduct under NYSHRL § 296 (1) (a).

134.    Plaintiff acted in opposition to such unlawful conduct by making good faith claims and/or complaints of sexual harassment and discrimination to Defendant and appropriate authorities, including the EEOC.

135.    Defendant had actual knowledge of Plaintiff's activities in respect of making good faith claims and/or complaints of sexual harassment and discrimination to Defendant and appropriate authorities, including the EEOC.

136.    As a proximate result of Plaintiff's activities in respect of making good faith claims and/or complaints of sexual harassment and discrimination to Defendant and appropriate authorities, including the EEOC, Defendant engaged in adverse treatment of Plaintiff, including, inter alia, terminating her employment.

137.    As a result of Defendant's actions, Plaintiff is unable to return to comparable employment.

138.    The aforementioned acts of Defendant constitute unlawful retaliation against Plaintiff in violation of the provisions of NYSHRL § 296 (1) (a).

139.    As a proximate result of Defendant's aforementioned retaliation against Plaintiff, Plaintiff has and will continue to suffer substantial losses, including the loss of past and future earnings, bonuses, deferred compensation and other employment benefits.

140.    As a further proximate result of Defendant's actions, Plaintiff has and will continue to suffer irreparable and significant damage to her personal and professional good name and reputation.

141.    As a further proximate result of Defendant's actions taken because of Plaintiff's sex, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

142.    As a result of the foregoing, Plaintiff is entitled to recover from Defendant an amount equal to the value of all compensation to be earned by Plaintiff had her employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

143.    As a result of the foregoing acts, Plaintiff is entitled to recover an amount to be determined at trial in compensatory damages from Defendant in addition to all other amounts sought herein.

144.    In committing the acts alleged herein, Defendant acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages in an amount to be determined at trial to adequately punish Defendant, jointly and severally, and to deter Defendant from continuing and repeating such conduct in the future.

## AS AND FOR A SIXTH CAUSE OF ACTION

**RETALIATION IN VIOLATION OF NEW YORK CITY HUMAN RIGHTS LAW § 8-107**

145.   Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

146.   Based upon the aforementioned facts, Plaintiff had reasonable belief that Defendant were engaged in unlawful conduct under NYCHRL § 8-107.

147.   Plaintiff acted in opposition to such unlawful conduct by making good faith claims and/or complaints of sexual harassment and discrimination to Defendant and appropriate authorities, including the EEOC.

148.   Defendant had actual knowledge of Plaintiff's activities in respect of making good faith claims and/or complaints of sexual harassment and discrimination to Defendant and appropriate authorities, including the EEOC.

149.   As a proximate result of Plaintiff's activities in respect of making good faith claims and/or complaints of sexual harassment and discrimination to Defendant and appropriate authorities, including the EEOC, Defendant engaged in adverse treatment of Plaintiff, including, inter alia, terminating her employment.

150.   As a result of Defendant's actions, Plaintiff is unable to return to comparable employment.

151.   The aforementioned acts of Defendant constitute unlawful retaliation against Plaintiff in violation of the provisions of NYCHRL § 8-107.

152.   As a proximate result of Defendant's aforementioned retaliation against Plaintiff, Plaintiff has and will continue to suffer substantial losses, including the loss of past and future earnings, bonuses, deferred compensation and other employment benefits.

26

153.    As a further proximate result of Defendant's actions, Plaintiff has and will continue to suffer irreparable and significant damage to her personal and professional good name and reputation.

154.    As a further proximate result of Defendant's actions taken because of Plaintiff's sex, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

155.    As a result of the foregoing, Plaintiff is entitled to recover from Defendant an amount equal to the value of all compensation to be earned by Plaintiff had her employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

156.    As a result of the foregoing acts, Plaintiff is entitled to recover an amount to be determined at trial in compensatory damages from Defendant in addition to all other amounts sought herein.

157.    In committing the acts alleged herein, Defendant acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages in an amount to be determined at trial to adequately punish Defendant and to deter Defendant from continuing and repeating such conduct in the future.

## **ATTORNEY'S FEES AND COSTS**

158.    Attorney's fees and costs are warranted in this matter as the undersigned, on behalf of Plaintiff, have in good faith, attempted to negotiate a reasonable resolution with

Defendant without having to refer this matter to this forum for adjudication, determination and final resolution on the merits.

## PUNITIVE DAMAGES – BAD FAITH

159.    It is presumed that parties to contracts undertake their respective obligations in good faith, with intent to deal fairly.   In light of Defendant's obvious and blatant bad faith, wrongdoing and breach of other duties, ***punitive damages*** should be assessed against Defendant so that they be deterred from attempting such harmful employment practices in the future.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests that this Court order the following relief in favor of Plaintiff:

I.    An award of Plaintiff's actual damages in respect of loss of wages, promotional opportunities, including an award of front pay compensating Plaintiff for loss of future salary and benefits had her employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%;

II.    An award of compensatory damages in an amount to be determined at trial;

III.    An award of punitive damages in an amount to be determined at trial;

IV.    An order enjoining Defendant from engaging in the wrongful practices alleged herein;

V.    An award of prejudgment interest, costs and attorney's fees; and

VI.    Such other and further relief that the Court may deem just and proper.

28

## <u>DEMAND FOR TRIAL BY JURY</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury

on all questions of fact raised by the complaint.


Dated:          New York, New York
                May 23, 2017


                              Respectfully submitted,

                              **SACK & SACK, LLP**

                                   */s/ Jonathan Sack*
                                   _____
                              By:
                                   Jonathan Sack, Esq.  (JSS 1835)

                              **Attorneys for Plaintiff**
                              **Noa Kolp**
                              70 East 55th Street, 10th Floor
                              New York, New York 10022
                              Tel.: (212) 702-9000
                              Fax: (212) 702-9702